UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.  12-104 (RHK/FLN) |
| | ) | |
| v.                    Plaintiff, | ) | |
| | ) | **POSITION OF THE DEFENDANT** |
| SAMUEL JAMES JOHNSON, | ) | **WITH RESPECT TO SENTENCING** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Mr. Johnson, by and through his attorney, Douglas Olson, hereby submits this

position paper concerning sentencing in the above-referenced case.  Mr. Johnson pled

guilty on June 6, 2012, to being a felon in possession of a firearm.  The plea agreement

sets forth the government's belief that Mr. Johnson was subject to sentencing as an armed

career criminal, that his guidelines would be 168-210 months, and that he was subject to

the fifteen year mandatory minimum sentence. [1]  The defendant reserved the right to

challenge sentencing as an armed career criminal.  The PSR has adopted the

government's position regarding armed career criminal status, although it has determined

his ACCA guidelines to be 135 - 168 months.  The government, in its position paper,

requests that the court adopt the findings of the PSR and is requesting a sentence of 180

months, the mandatory minimum sentence.

---

[1]  The three ACCA predicate convictions are: possession of a sawed off shotgun,
attempted simple robbery, and simple robbery.

It the defendant's position that Mr. Johnson should not be sentenced as an armed career criminal for three reasons: one, possession of a sawed off shotgun is not a "crime of violence;" two, the ACCA "residual clause" is unconstitutionally vague; and three, Mr. Johnson's conviction for "attempted simple robbery" is not a "crime of violence." Mr Johnson requests that the court determine his that his non-ACCA guidelines are level 23, and with a criminal history category III, the resulting guideline range is 57-71 months, and asks that the court sentence within that range.

## BACKGROUND

Samuel Johnson is 32 years old.  He is married and is the father of four children. He has never been to prison, and the four or so months he has spent incarcerated at the Sherburne County jail equals his longest previous period of incarceration (March - July 2007, discussed further herein).

Mr. Johnson was born in Florida, and when he was a baby his parents moved to Austin, Minnesota, and he has been there ever since.  He has one younger sister.  Samuel Johnson's father was a violent, angry, and abusive man, and he took out his aggression and violent tendencies on his son and his wife.  Samuel Johnson cannot account for his father's violence and anger; his father was not a drinker or drug abuser, although there certainly is a strong suggestion of some underlying mental illness.  Whatever drove his father's behavior, it negatively affected Samuel.  Samuel was physically and mentally abused throughout his childhood; he was regularly beaten with a belt, punched, slapped,

2

and spit on by his father.  On the mental side, his father would routinely drive his

daughter to school and force his son to walk, even in the cold of winter, for no good

reason and with no explanation.  His sister was not subject to the same brutality or scorn,

again, there was no reason behind any of this behavior.  One favorite form of torment was

requiring Samuel to stand in the corner for hours after he came home after school until his

mother came home.  These are the endearing memories of his childhood in Austin.

By the time Samuel was ten,  he was tagged by his teachers as "acting out," and he

was diagnosed with ADHD and prescribed Ritalin.  This was undoubtedly an improper

diagnosis, as he was nothing more than an abused and neglected child, trying to cope with

his father's increasingly bizarre behavior and the constant abuse.  In addition to being

abused by a madman, he was also improperly medicated from the time he was 10 until 15,

taking increasingly strong doses of a narcotic grade drug (Ritalin) that was improperly

prescribed.  All of this led to a progression of events: moving in with his grandparents at

age 13, abusing drugs at a young age, in-patient treatment leading to halfway house

placements, and a brief unsuccessful return home, leading Samuel to finally drop out of

school and leave home at age 16.

At age 16, he moved in with his aunt, who lived in St. Louis Park.  Samuel was

already a regular pot smoker and had experimented with methamphetamine.  He

discovered that his Aunt too was a user and so he began using meth with her.  During the

year that he lived with his Aunt, he met H.G., the mother of his four children.  After he

turned 18, he moved out of his Aunt's apartment, eventually moved back to Austin, and he and H.G. lived together and they had a somewhat tumultuous relationship for twelve years that eventually ended due to her continued drug use (Samuel Johnson quit using drugs years ago), her infidelity, and her general instability.  They have four children: two sons, ages 13, 11, and two daughters, ages 4, and 3.  When these charges were filed last spring,  Mr. Johnson had custody of all four of his children.

Mr. Johnson has always worked and provided for his family.  He worked various fast food jobs type jobs after leaving highschool.  He worked at Burger King for nearly two years (2003-2004), Arbys for about a year (2005), worked for a temporary service from 2005 through 2007, worked at Watts Cooking in their Kitchen (2007), worked the night maintenance shift at the YMCA for almost two years (2007-2009), worked for a fishing company in the spring of 2011, then worked for Quality Building Maintenance from 2011 - 2012.  During 2011-2012 he returned to school and earned his welding certificates.  He had just started working as a welder of Zierke Manufacturing when he was arrested on these charges in April.  He had plans to go back to school eventually and pursue an industrial engineering degree.

In 2010, Mr. Johnson met T.W., and they got married in February of 2011.  T.W. has four children of her own.  At the time of his arrest, three of her children (one lives with her father) and his four children were living in Austin together.  T.W. recently moved with her children back to Illinois to be near her family.  She is an LPN, has always

4

been gainfully employed, and remains supportive of her husband and will be there for him throughout his period of incarceration.

While Mr. Johnson has a criminal record, the bulk of his criminal history involves a series of offenses in 2006/2007 that led to him serving a total of about four months in the local jail, three Alford pleas, and concurrent stayed sentences. All three of his criminal history points were accumulated from three concurrent stayed sentences imposed at a single sentencing hearing in 2007. He is by no means a hardened criminal, and his ACCA designation is an aberration.

Mr. Johnson had a largely meaningless juvenile record, and a theft conviction at age eighteen (no points). He has a conviction for "attempted simple robbery" at age nineteen (1999 offense, 2000 conviction) for which no criminal history points attach. A roommate of his moved out in the middle of the night, owing him a good chunk of change. Mr. Johnson went over to this person's mother's house the next day, demanded he pay his debt, and they had a verbal confrontation. While Mr. Johnson had a bb gun pistol in his pocket, he maintains he never brandished it. There was a brief confrontation, no robbery occurred, and then Mr. Johnson drove off in his car. He was later arrested, and pled to "attempted simple robbery." He got a stayed sentence (he actually served one day in jail and was released by the jail), completed his probation without incident, and the charge was reduced to a misdemeanor by operation of Minnesota law. The PSR

characterizes this as a "crime of violence" and is noted as his first ACCA predicate

offense.[2]

Mr. Johnson remained law abiding and out of trouble until a string of incidents

took place in 2006/2007.  In August of 2006, Mr. Johnson was asked by a "friend" to

drive him to the video store to get a movie.  He drove that person to the store and parked

behind the store in the parking lot.  The person he was with got out of the car and was

supposed to go into the store and get a movie.  This person, unbeknownst to Mr. Johnson,

had apparently made arrangement to meet someone elsewhere in the parking lot, and

while Johnson waited in the car, the other person went around the side of the store,

robbed this other person, and returned to Mr. Johnson, who was waiting in the car.

Mr. Johnson drove off, and had no idea that anything untoward had taken place.  In a

strange twist of events, Mr. Johnson got arrested after being identified as the driver of the

car.  He fought the charges, and the following July (nearly a year later) resolved those

charges (simple robbery) with an Alford plea, time served, and a stayed sentence.  This is

ACCA predicate number two.  (PSR ¶43).

A few days after the video store parking lot robbery allegedly took place,

Mr. Johnson and a friend sold grocery store mushrooms to a possible informant as a

practical joke.  While Mr. Johnson can be criticized for not thinking this through, he did

not know this was illegal, and ended up getting charged with sale of a simulated

---

[2]  The defendant objects to the factual description of this offense as described in the PSR.
(PSR ¶41).

controlled substance.  He fought these charges, and these too were resolved by an Alford

plea in July 30, 2007 for time served and a stayed sentence.  This is <u>not</u> an ACCA

predicate.  (PSR ¶44).

Finally, in March of 2007, Mr. Johnson was a passenger in someone's else's car

and some one reported they were involved in selling drugs.  Officers responded to the

scene, searched the car, and a sawed off shotgun was discovered in a paper bag on the

floorboard of the back seat of the car.  Marijuana was also discovered in the car.

Mr. Johnson was arrested and remained in jail while his various cases were resolved.  On

July 30, 2007, he entered an Alford plea to the possession of a sawed off shotgun charge,

in conjunction with resolving all of his pending cases.  (PSR ¶45).  He was released from

jail pending sentencing, and on November 1, 2007 was given stayed sentences and

concurrent time on all three cases.

As to this offense, Mr. Johnson was involved in the various firearms transactions

with the Confidential Source (CS) and the Undercover Contact/Agent (UC) as described

in the PSR.  Prior to meeting these two people, Mr. Johnson had not been involved in any

firearms transactions.  The CS was a friend that he met through his political activity, and

had known him the last few years.  The CS introduced him to the undercover agent, and

Mr. Johnson assisted them in theses various gun transactions, and on one occasion went

with them to a shooting range.  Simply put, he got involved in these deals because money

was short, and he thought he was dealing with friends.  He deeply regrets what he did.

During his four months in jail before copping the Alford pleas in July of 2007, Mr. Johnson spent his time reading.  He was interested in his Nordic heritage, and began reading political, social, and anthropology books.  He became interested in certain issues, and he would later pursue immigration related reform.  These beliefs may be unpopular in the liberal press, but he saw certain things happening that he did not agree with, and he decided to find others that shared his political beliefs.

In 2007, he discovered an organization called Minnesota Citizens For Immigration Reform and he attended several meetings and protests they sponsored.  These were mostly older folks, and he started looking for other organizations to hook up with.  In 2008, he discovered the National Socialist Movement (NSM) via the internet; the organization was largely inactive in Minnesota, he help revive the Minnesota Chapter, and in 2009 became the "State Leader."  Mr. Johnson thinks the organization consisted of six members.  They organized some immigration related protests.  Mr. Johnson resigned from the organization in June of 2010.

After that, Mr. Johnson, the Informant, and the Undercover Agent formed the "Aryan Liberation Movement," which consisted of those three members; this "organization" was little more than a shared email address where they communicated and exchanged ideas.  After he met TW and got married in 2011, he tapered off his involvement in his political matters, as he was working, going to school to earn his welding certificates, and taking care of their seven children.  By the time of his arrest, his

brief foray in politics was pretty much a thing of the past, as he had started a new job as a

welder, had custody of all his kids, and no longer had the time or interest in pursuing

these matters.  His brief career as a political operative amounted to little more than a few

protests and a lot of talk, most of which was with his friends the informant and the

undercover agent.

## OBJECTIONS TO THE PSR

The defense has a number of objections to the various factual portions of the PSR

which the defense maintains are either inaccurate, misleading or which are inappropriate

for inclusion in a PSR.  In particular, defendant takes issue with much of the information

included in the PSR concerning his political beliefs and the attempt to characterize him as

an extremist.  These are important matters which will adversely affect him during his

incarceration, will impact his BOP security classification and designation, and

undoubtedly be used by BOP officials to his detriment during his years in their custody.

First, as to ¶ 3, the defense disputes that Joseph Thomas' methamphetamine

indictment is a "related case" and asks that this paragraph be deleted from the PSR.

Mr. Johnson had nothing to do with Mr. Thomas' meth distribution charges, he was not

involved in meth distribution in relation to this or any other offense, and is prejudiced by

the mention of Mr. Thomas' indictment in his PSR.

Second, as to ¶ 11, this whole discussion of counterfeiting and the suggestion that

this was Mr. Johnson's idea or something that he thought it was worth pursuing is

misleading.  The suggestion was not brought up by Mr. Johnson, it was posed to him by

the CI (CS) and the FBI Undercover Agent (UC).  This is the context of this discussion:

there were arrests being made and he (Samuel) sent them (the CS and UC) a link to the

story in the newspaper about people getting busted.  The undercover agent then brought

the issue up to him; and Mr. Johnson him that he did not know if it was a good idea

because people were getting arrested and said it was up to the agent; Mr. Johnson told

them that if they were going to do it, use smaller denominations; this was nothing more

than an afterthought to the conversation.  Mr. Johnson also told repeatedly that he was not

interested in pursuing this; but they kept mentioning it.  This was all talk and nothing

further ever came of it.

As to the comments attributed to Mr. Johnson in ¶15, Mr. Johnson wants the court

to know that this was all stupid and ridiculous talk and nothing ever came of it.  They (he,

the CS, and UC) were close friends (he thought) and used to have these "hypothetical

futuristic discussions," in which they posited "what if" hypotheticals, some of which

related to futuristic literature (various books) they discussed concerning various futuristic

scenarios.  This was talk amongst friends and Samuel Johnson never intended that

anything serious would ever come of any of this talk.  We ask that this be deleted from

the PSR.

As to the comments in ¶16, any discussions of "attacks" was nothing more than

stupid macho talk, and Mr. Johnson had no intent to follow through with any of this, and

he took no steps at all to advance any such actions.  He strenuously objects to the reference to the Mexican consulate attack as he had nothing to with this and he was never part of the "plan."  This was all Thomas' idea, Mr. Johnson had nothing to do with it, he never agreed with it, and it is inappropriately attributed to him.  This is very prejudicial and should be deleted from his PSR.

Next, the defendant objects to the four level enhancement proposed in ¶ 28 (which is a moot point here unless he is not sentenced to the 15 year ACCA mandatory minimum.)  Any talk of future violence, as outlined above, was never intended as anything more than talk, never amounted to anything, and they took no substantial efforts to move these thoughts beyond talk.  As such, if non-ACCA guidelines are followed, the four level enhancement is not appropriate.

Finally, we object to ¶ 61 in total and ask that it be deleted from the PSR.  This paragraph concerning his political beliefs has nothing to do with the offense of conviction, and raises the likelihood that he will be punished for having unpopular political beliefs.  Including it in the PSR as a sentencing factor is a violation of this first amendment rights.  The BOP will use this paragraph to his detriment throughout his fifteen year period of incarceration, so this is an important issue.  Political affiliation is not normally included in the PSR, and discussing his involvement with unpopular political organizations is inappropriate.  We strongly object to the last sentence alleging derogatory comments regarding various races and sexual orientation as this has nothing to

do with this offense, is likewise inappropriate for inclusion in a PSR and  consideration of these comments as a sentencing factor violates his first amendment rights and we ask that it be stricken.

## THE DEFENDANT OBJECTS TO SENTENCING AS AN ARMED CAREER CRIMINAL

The defense  raises three challenges to sentencing as an armed career criminal. The defendant raises these challenges both on their merits, and with the intention of preserving these for appellate review.  These objections are: one, the defendant maintains that under current Supreme Court precedent, possession of a sawed off shotgun is not a "crime of violence."  Second, the defendant maintains, consistent with the current thinking of Justice Scalia, that the ACCA's "residual clause" is unconstitutionally vague. Third, defendant maintains that his conviction for "attempted simple robbery" is not a "crime of violence."

As to the issue of whether possession of a sawed off shotgun is a crime of violence, defendant notes contrary Eighth circuit precedent.  *United States v. Vincent*, 575 F.3d 820 (8th Cir. 2009).  *See also United States v. King*, 598 F.3d 1043 (8th Cir. 2010) (discussing *Vincent* in the context of a juvenile adjudication for possession of a dangerous weapon).  It is the defendant's position that *Vincent* was wrongly decided, and is contrary to the court's subsequent ACCA decisions in *Sykes v. United States*, 131 S.Ct. 2767 (2011) and *Johnson v. United States*, 130 S.Ct. 1265 (2010).  In addition, this court

12

should take note of Judge Gruenders's dissenting opinion in *Vincent*, *supra*, as further

indication that this issue is on less than a firmly settled ground.

More importantly, there is a circuit split on this issue.  In *United States v. McGill*,

618 F.3d 1273 (11th Cir. 2010) the Eleventh Circuit ruled that possession of a sawed off

shotgun is not a "crime of violence."  *See also United States v. Hoste*, 292 Fd. Appx. 249

(4th Cir. 2008) (possession of sawed-off not a crime of violence); *United States v. Serafin*,

562 F.3d 1105 (10th Cir. 2009)(same).  In *United States v. Bradford*, 766 F.Supp. 2d 903

(E.D. Wisc. 2011), Wisconsin Judge Adelman court reached a similar decision, and

observed:

> Under *Begay*, then, a residual clause predicate crime must (1) present a serious
> potential risk of physical injury similar in degree to the enumerated crimes of
> burglary, arson, extortion, or crimes involving the use of explosives; and (2)
> involve the same or similar kind of "purposeful, violent, and aggressive"
> conduct as the enumerated crimes.  For the reasons that follow, I find that
> possession of a short-barreled shotgun fails both prongs of the *Begay* test: it
> does not involve "violent" and "aggressive" conduct, as those words are
> commonly understood; and it does not present the same or similar degree of
> risk as the closest enumerated offense, i.e., the use of explosives.  I will survey
> the post-*Begay* case-law on this issue and in so doing explain the bases for my
> conclusion.

> \* \* \* \* \* \* \* \* \*

> Post-*Begay*, courts should draw a distinction between "active" and "passive"
> crimes to determine whether they involve violent and aggressive conduct.
> Because possession of a short-barreled shotgun, a passive crime, does not
> involve such conduct, it does not qualify as a violent felony under the ACCA.

> \* \* \* \* \* \* \* \* \*

13

> Further, to the extent that *Begay* requires the court to compare the risk created by a putative residual clause predicate to that created by the enumerated crimes, possession of a short-barreled shot-gun fails to measure up. Common-sense tells us that *possession* of a dangerous item does not pose the same or similar degree of risk as *use* of that item. For this reason, as well, the offense does not qualify as a violent felony under the ACCA.

*Bradford*, 766 F.Supp 2d. 907-909 (citations omitted). Judge Adelman's opinion is also insightful for its thoughtful discussion of the merits of Judge Gruerner's dissent in *Vincent. Id.*

Accordingly, the defendant urges this court to adopt the better reasoning advanced in these decisions and rule that possession of a sawed off shotgun is not a crime of violence under the ACCA residual clause. Such a ruling cannot stand following *Sykes*, and *Vincent* should not be followed.

Next, the defendant maintains that the ACCA residual clause is unconstitutionally vague. As noted by Justice Scalia in *Sykes v. United States*, 131 S.Ct. 2267 (J.Scalia, dissenting) (2011):

> We should admit that ACCA's residual provision is a drafting failure and declare it void for vagueness. . . . The reality is that the phrase 'otherwise involves conduct that presents a serious potential risk of physical injury to another' does not clearly define the crimes that will subject defendants to the greatly increased ACCA penalties.

*Sykes*, 131 S.Ct. at 2284-2287 (J. Scalia, dissenting). Accordingly, the defendant requests that the court adopt the reasoning of Justice Scalia and the rule the ACCA void for vagueness.

14

Finally, the defendant maintains that his conviction for "attempted simple robbery" under Minn. Stat.§§609.24 and 609.17 is not a crime of violence under the facts of that case (no violence) or under the elements of the crime of conviction.  It should be noted that this was an "Alford plea," (which we recognize does not impact the validity of the conviction); but we dispute and object to the "facts" as outlined in the complaint summary in the PSR and ask that the court not rely upon the PSR summary in its sentencing decision.  It should be noted that this was an "attempt" conviction, and an "attempt" can be accomplished in a variety of  manners, some of which do not involve the use of physical force or violence towards others.  Some courts have differentiated "attempt" convictions, distinguishing them from the Supreme Court's attempted burglary precedent in *James v. United States*, 550 U.S. 192 (2007), cf. *United States v. Martinez*, 602 F.3d 1166 (10th Cir. 2010); *United States v. Burghardt*, 796 F.Supp. 2d 966 (D. Neb. 2011), observing that the many instances that an "attempt," may be accomplished without use of force or violence towards others.  We urge this court to find that "attempted simple robbery" is not a crime of violence.

If the court were to agree that the fifteen year mandatory minimum penalty does not apply, then Mr. Johnson's sentence would be determined by his non-ACCA guidelines and application of the sentencing factors set forth in 18 U.S.C. 3553(a).  "The Guidelines are not only ***not mandatory*** on sentencing courts; **they are also not to be *presumed* reasonable**." *Nelson v. United States*, 129 S.Ct. 890, 894 ( 2009)(emphasis

15

added).  In *Booker*, the United States Supreme Court held that the United States

Sentencing Guidelines are advisory, and that District Courts must examine all factors set

forth in 18 U.S.C. §3553(a) and impose a sentence that is "sufficient but not greater than

necessary" to accomplish the goals of sentencing.  *United States v. Booker*, 543 U.S. 220

(2005).  The triad of 2007 Supreme Court decisions made clear that Federal Courts must

determine sentences based on the facts and unique circumstances of the particular case,

and that the guidelines do not enjoy a presumption of reasonableness.  *Gall v. United*

*States*, 128 S.C. 586, 602 (2007) (finding a probationary sentence, substantially outside of

the guidelines, to be reasonable); *Kimbrough v. United States*, 128 S.C. 558, 570 (2007)

(noting that Courts may vary from guidelines ranges based solely on policy

considerations, including disagreements with the guidelines); *Rita v. United States*, 127

S.C. 2456, 2465 (2007) (holding that a District Court may consider arguments that "the

Guidelines sentence itself fails properly to reflect §3553(a) considerations").  These

decisions "mean that the District Court is free to make its own reasonable application of

the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines."

*Kimbrough*, 128 S.C. at 577 (Scalia, J., concurring).  The "truly advisory" holding of

these cases was made abundantly clear by Justice Stevens: "I trust that those judges who

had treated the Guidelines as virtually mandatory during the post-Booker interregnum

will now recognize that the Guidelines are truly advisory."  Rita, 127 S.Ct. at 2474 (J.

Stevens, concurring).

A reasonable sentence in this case is a sentence within the non-ACCA guideline range.[3]  Mr. Johnson is not a hardened criminal or a dangerous individual.  He is a family man, who at the time fo his arrest was working as a welder, and taking care of his family and their seven children.  He is appropriately remorseful, has learned his lesson, and a sentence of fifteen years is far "greater than necessary."  A sentence within the non-ACCA range is more than sufficient to satisfy the purposes of federal sentencing.  For the reasons discussed herein, it is respectfully submitted that the court impose a non-ACCA sentence within the non-ACCA guideline range of 75-71 months.


Dated:   August 30, 2012                         Respectfully submitted,

                                                 *s/ Douglas Olson*
                                                 _____
                                                 DOUGLAS OLSON
                                                 Attorney ID No.  169067
                                                 Attorney for Defendant
                                                 107 U.S. Courthouse
                                                 300 South Fourth Street
                                                 Minneapolis, MN 55415

---

[3]  Another reason to reject the application of the mandatory minimum in this case under 924(e) is that it directly conflicts with this court's sentencing authority and directives under 18 U.S.C. § 3553, et.seq., to, amongst other things, impose a sentence "not greater than necessary" to achieve the statutory purposes of sentencing.